UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

JERRY LEE WILLIAMS JR.         CIVIL ACTION NO. 5:14-CV-3483

VERSUS                         JUDGE WALTER

WARDEN LOUISIANA STATE         MAGISTRATE JUDGE HORNSBY
PENITENTIARY

## REPORT AND RECOMMENDATION

### Introduction

A Caddo Parish jury convicted Jerry L. Williams ("Petitioner") of second-degree murder and attempted second-degree murder. The convictions were affirmed on direct appeal. State v. Williams, 974 So.2d 157 (La. App. 2d Cir. 2008), writ denied, 992 So.2d 983 (La.). Petitioner also pursued a post-conviction application in state court. He now seeks federal habeas corpus relief based on two claims, (1) actual innocence and (2) bias of the trial judge who ruled on a post-conviction application. For the reasons that follow, it is recommended that the petition be denied.

### Relevant Facts

The victims were Sara Mims Payton and her 24-year-old son, Alonzo Mims, who lived near the corner of Looney Street and Pierre Avenue in Shreveport. Ms. Payton testified that she had known Petitioner and his family since before Alonzo was born, and Petitioner and his younger brother, Jason, had visited her home many times. Petitioner had

been to her home the night before the crimes, when he stopped by to get a jacket that he left there.

Ms. Payton and Alonzo walked to a nearby grocery store, and they were returning through a vacant wooded lot when they saw Petitioner. Ms. Payton spoke to him, and Petitioner and Alonzo began talking. Ms. Payton kept walking towards her house, and she asked Alonzo, who had the keys, to let her inside. She said that as Alonzo turned toward her to answer, Petitioner drew a gun, put it to the side of Alonzo's head, and shot him. Ms. Payton started running, but Petitioner chased her down and shot her in the upper shoulder as she lay on the ground. The bullet passed through her neck and into her mouth, and she spit the bullet onto the ground. Alonzo died as a result of his wound.

At the emergency room, Ms. Payton could not initially remember Petitioner's name. She was able to tell police he was one of two brothers who lived on nearby Ziegler Street, and she knew he was the one with "cat eyes." She explained that he had slanted eyes and thick eyelashes. Ms. Payton was moved to a burn unit, where she was shown a photo lineup. She identified Petitioner as the shooter. At trial, Ms. Payton testified with certainty that it was Petitioner who did the shooting. She said that she knew Petitioner and his brother well and could tell them apart. She believed the younger brother, Jason, had some knowledge or involvement in what happened, but she had "no doubt whatsoever" that it was Petitioner who shot her and her son. Tr. 479-495.

Police recovered two fired cartridge cases and one spent bullet from the scene. A bullet fragment was taken from Alonzo's body. Police were later working a separate case that involved an acquaintance of Petitioner, and they seized a Hi-Point .380 ACP handgun

from that man's home. A crime lab expert testified that it was his opinion that both cartridges and the bullet recovered at the crime scene had been fired from that pistol. He was not able to positively match the fragment taken from Alonzo, due to damage to the fragment, but it did have similar general characteristics as a bullet fired from the seized gun. The gun was not directly linked to Petitioner. A local pastor testified that he saw Petitioner riding a bicycle on the morning of the shooting, within a couple of blocks from the scene of the crime, and Petitioner was carrying a dark handgun. The pastor said that he knew both Williams brothers, could tell them apart, and was certain it was Petitioner he saw with a gun.

The jury heard from these witnesses, as well as the police officers who conducted the investigation. Sergeant Jody Jones spoke to Ms. Mims at the hospital. She told him that the shooter was the older of two brothers who lived nearby. She could not recall if his name was Jerry or Jason or Jonathon, but she "knew for sure" that it was the older brother, who she described as having cat eyes. When shown a photo lineup, Ms. Mims picked Petitioner's photo without hesitation. Petitioner testified that he was at a residence one street away and heard the shooting, but he claimed he had nothing to do with it. A unanimous jury convicted Petitioner on both counts.

**State Procedural History**

Petitioner's arguments on appeal focused on the admission of the expert ballistic testimony and the introduction of the gun into evidence. After the appeal concluded, Petitioner filed his first post-conviction application and asserted several issues. That application was denied at all levels of the state courts.

Petitioner filed a second post-conviction application and requested a new trial based on a claim of actual innocence. Petitioner said he had discovered new evidence that his brother, Jason Williams, was the actual shooter. Judge Ramona Emanuel appointed counsel and held an evidentiary hearing. Jason Williams (Tr. 1295-1349) claimed that he did the shootings and tried to confess to police soon afterward, but they ignored him.[1] He told a difficult-to-believe tale about not knowing Alonzo Mims until a week before the shooting, when he suddenly decided to ask Alonzo to hold a gun for him at a football game so that police providing security would not see Jason with it. He said Alonzo refused to return the gun, which belonged to Jason's mother, so Jason borrowed the murder weapon from Irving Armstrong (in whose house police later found the gun) and shot Mims and his mother. Jason, who admitted smiling throughout his direct testimony and cross-examination (Tr. 1331), often emphasized facts that he knew about the crime, such as where the bullets entered the victims. He said he was in frequent contact with his brother but denied getting information from him or police reports about the crime.

When the prosecutor began probing Jason's story, he said, "I ain't got time to be cross-examined" and "I've said enough." Tr. 1332. The prosecutor said that Jason was being evasive, and Jason responded by laughing. Tr. 1334. When the prosecutor started to ask Jason questions that the shooter would know how to answer (whether he was standing or sitting when he fired, the distance between him and the victim, etc.) but were not stated

---

[1] An officer testified at the trial that he made contact with Jason a few days after the shootings. Jason was not cooperative and did not make a statement about the shootings. He was arrested on an unrelated arrest warrant. Tr. 712.

in the police reports, Jason said, "At this point in time, I'm feeling nervous from the cross-examination. I would like to step down." He refused to answer any additional questions. Tr. 1337.

The State reports that Judge Emanuel denied relief in open court and that there is no transcript of that ruling. Petitioner began complaining about the lack of a written ruling. He eventually obtained mandamus relief from the state appellate court, and Judge Emanuel issued a written decision.

Judge Emanuel wrote that she looked to the trial testimony of Sara Payton, who had since died, where Payton identified Petitioner as the shooter and distinguished him from his brother based on his "cat-like eyes." Judge Emanuel wrote that from looking at the brothers they "look like brothers but do not look so similar as to be mistaken for each other by a person who knows them both." She added that Petitioner's eyes "can be described as 'cat-like eyes' due to the shape of his eyes and his eyelashes." She found that "the testimony of Jason Williams was **not** credible in its entirety" due to "numerous inconsistent statements," his demeanor on the stand, and his refusal to complete answers on cross-examination. Jason simply "could not be believed." For these and other reasons, Judge Emanuel denied the request for a new trial. Tr. 1706-08.

Petitioner pursued writ applications in higher courts. He complained that Judge Emanuel abused her discretion, alleged a new <u>Brady</u> claim, and accused witnesses of perjury. He complained in his application to the Supreme Court of Louisiana that he was at a disadvantage in filing his writ application with the appellate court (filed in August 2013) because he did not have a written ruling from the trial court (which was issued in

May 2013).  The Supreme Court denied writs without comment.  The details of Petitioner's post-conviction proceedings, merely summarized here, are set forth in detail (with record references) in the State's helpful memorandum.  Doc. 15, pp. 3-5.

**Actual Innocence**

    **A.  Inadequate Briefing**

Petitioner filed with this court a petition (on a form provided by the court) and a supporting memorandum.  The petition lists his first issue as actual innocence based on the argument that it was his brother, Jason, who committed the crimes and who has confessed to them.  Doc. 1, p. 5.  The petition simply lists the issue and does not provide factual details or legal argument, which is the role of the memorandum.  The supporting memorandum, however, provides even less information about the basis of this habeas claim.  It contains the handwritten words "actual innocence" in a heading on page seven, but there is no argument anywhere in the memorandum on this issue.  The failure to brief this claim warrants denying it as waived or abandoned.  Lookingbill v. Cockrell, 293 F.3d 256, 263 (5th Cir. 2002) ("Where a habeas petitioner fails to brief an argument adequately, we consider it waived."); Pea v. Cain, 2017 WL 1197872, *12 (M. D. La. 2017) (collecting district court decisions that found waiver where a habeas claim was not adequately briefed).

    **B.  Lack of Exhaustion**

The State argues that the claim is also barred because Petitioner did not exhaust his state court remedies prior to bringing the claim to this court as required by 28 U.S.C. § 2254(b)(1)(A).  Proper exhaustion requires that the claim be presented at each level of the state court, including in a petition for discretionary review to the state's highest court.

O'Sullivan v. Boerckel, 119 S.Ct. 1728, 1732 (1999). Petitioner's writ application to the Supreme Court of Louisiana—the one that followed his hearing on the actual innocence claim— complained of procedural issues, alleged mistakes by the clerk of court, and argued there were other problems with the state court proceedings. But it did not present the merits of an actual innocence claim. Tr. 1715-28.

The claim would be time-barred if Petitioner attempted to return to state court now and properly exhaust it, so the claim is subject to a procedural bar that cannot be overcome absent a showing of cause and prejudice. Jones v. Jones, 163 F.3d 285-296 (5th Cir. 1998). Petitioner cannot show cause because he has only himself to blame for omitting the claim from his petition, and there is no prejudice because the claim lacks merit.

### C. Lack of Merit

The claim fails on the merits because a claim of actual innocence based on newly discovered evidence does not state an independent ground for habeas relief. Rather, a claim of actual innocence may only serve as a gateway through which a habeas petitioner must pass to have an otherwise procedurally barred constitutional claim considered on the merits. Herrera v. Collins, 113 S.Ct. 853 (1993); Coleman v. Thaler, 716 F.3d 895, 908 (5th Cir. 2013). Petitioner presents an independent substantive claim that he is actually innocent, and that is not a basis for habeas relief. Furthermore, he has not demonstrated that the state court's rejection of this claim, after an evidentiary hearing, was so mistaken

as to permit relief under the demanding standard of 28 U.S.C. § 2254(d)[2] and the presumption afforded state court factual findings under Section 2254(e)(1).[3]

**Judicial Bias**

Petitioner's second claim is that Judge Emanuel was biased when she ruled on his second post-conviction application. Doc. 1, p. 7. His supporting memorandum revisits his old complaint that he could not properly pursue appellate relief in the state courts without a ruling from the trial court. He complains that procedural steps by the clerk of court and the various state courts in connection with his post-conviction application violated various Louisiana statutes and rules.

Petitioner labels this claim as one regarding judicial bias, but the alleged bias and all of the related procedural irregularities that he alleges occurred during the post-conviction proceedings. The federal habeas court does not sit to correct procedural errors alleged to have happened in the post-conviction process. "[I]nfirmities in State habeas proceedings do not constitute grounds for relief in federal court." Rudd v. Johnson, 256 F.3d 317, 319 (5th Cir. 2001). See Kinsel v. Cain, 647 F.3d 265, 273 (5th Cir. 2011) ("no state habeas infirmities" rule barred habeas review of claim that state appellate court

---

[2] The statute provides that habeas relief is not to be granted on a claim adjudicated on the merits in state court unless the that adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

[3] The statute provides that in a habeas proceeding "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

violated due process during post-conviction proceedings). Petitioner is not entitled to habeas relief from his convictions based on this claim.

Accordingly,

**IT IS RECOMMENDED** that Petitioner's petition for writ of habeas corpus relief be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b). Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court

to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

      THUS DONE AND SIGNED in Shreveport, Louisiana, this 2nd day of February, 2018.

                                                Mark L. Hornsby
                                               U.S. Magistrate Judge